Good morning, Your Honors. My name is Christy Blazer, and I represent the plaintiff and appellant in this litigation involving a disability insurance policy which was wrongfully rescinded. My co-counsel, Curtis Thompson, was not able to be here today. However, I do have my client with me, Jeannie Ammann, who is seated over there. We do appreciate the graciousness of this Court in rescheduling the hearing for today when it had originally been scheduled for Monday. This is an appeal from a summary judgment in favor of the insurance company which rescinded the disability policy that had been purchased by our client, Al Ammann, who has since passed away. That company is Minnesota Mutual Life Insurance Company. We are requesting that this Court reverse the district court and remand a case such that our client is provided the opportunity to have a jury decide this case with proper guidance on certain legal issues. The district court committed an error of law by failing to properly apply the doctrines of imputed knowledge and inquiry notice to the facts of this case. In addition, it is Ammann's position that the district court selected facts to support the result that it reached. Facts and inferences contrary to the result were not considered or were rejected in the face of what Minnesota Mutual has argued to be overwhelming evidence in its favor. It was not the role of the district court to weigh the evidence, and that is what occurred. The district court found our opponent's evidence more persuasive. As this Court is well aware, the appropriate standard of review requires that any conflict in material facts must be decided by a jury, and Ammann is entitled to that. The underlying issue in this case is one of the most litigated issues in life and health insurance, and that is whether there was a material misrepresentation in the application for insurance which would entitle the insurer, here Minnesota Mutual, to rescind the policy. The cases from various jurisdictions are all over the board on the various issues presented in this case, the issues of imputed knowledge, inquiry notice, resolution of fact issues regarding the application process, whether materiality can be determined as a matter of law or fact, and whether the insured signature on an application is conclusive of the issue. As you are well aware, Montana law controls, and since rescission is an equitable remedy, the cases are very fact-intensive, and the good faith of all parties needs to be considered. I'd like to go first to the issue of imputed knowledge, and the Court need not really even look further than the Montana statute on this issue. Montana Code 2810604 provides that both principal and agent are deemed to have notice of whatever either has notice of and ought to, in good faith, communicate to the other. It is undisputed that the agent in this case who sold the disability policy to our client was informed about the back condition, which was later asserted by Minnesota Mutual to be a material misrepresentation. Let me stop you there. Let's get more specific. You say back condition. Exactly what information can be put into the head of the agent? I think that the information that can be put into the head of the agent was adequately summed up in a letter that he sent to our client at her request in November of 1996. That letter was sent shortly after the commencement of this lawsuit, when it was discovered that Minnesota Mutual was changing its focus to the back condition. And the letter, which is found at Exit of Record 103, Landa remembered that the discussion took place between he and Al Ahman about the back condition in early 1995. And this letter was written almost two years after that discussion. So he had a pretty good memory about it. Landa also remembered the mechanism of the injury, that Al Ahman had pulled a sign from the ground. Leonard Landa also remembered the diagnosis that Dr. Donaldson had provided, that the back had gotten strained. So there was a fairly specific amount of detail about that. Now, we know that the time frame was in early 1995 from the letter that Landa wrote. And during discovery, we were able to obtain the date timers of both Al Ahman and Agent Landa. During 1994, the year before this disability policy was issued, it was amazing. The date timers matched perfectly insofar as the dates of meetings between the insured Al Ahman and Agent Landa. Then in 1995, Al started using a computer memo master instead, but we still have Landa's date timer. And that shows that there were two dates on which the two men met. And one date was February 15, 1995, which was the date that the application was written out and Part 3 was signed by Al Ahman. And then there was March 23, which was the date that the policy was delivered. Those were the only two dates in early 1995 that Leonard Landa, the agent, and Al Ahman met. Al Ahman would propose that the more reasonable inference is that early means February 15, the date that Al Ahman actually signed Application Part 3. But even if it was the policy delivery date, Leonard Landa still had the obligation as the agent to communicate that information to Minnesota Mutual. He might ask... He did have specific instructions to that effect, and he failed to follow those instructions. Several reasons are in the record why Leonard Landa perhaps did not communicate that information about the back condition to Minnesota Mutual. Leonard Landa testified that he had sold disability policies to clients that had back problems. And that's found at ER 92. Landa also figured that Minnesota Mutual was going to obtain the medical records, and he had provided the name of the treating physician, Dr. Donaldson. That's found at further excerpt of Record 45. Landa was in a hurry to get the policy issued and get his commission. And there's several references in the record to that effect. He told Minnesota Mutual, you have complete underwriting in home office. He also said and told the other agent to please get the case by month end. Finally, he was using what was called the Gold Key Program at that time, which was a program designed by Minnesota Mutual to assist agents in getting cases processed faster. And the model of that particular program was to unlock the door to quicker commissions. So Landa was in a hurry to get this thing submitted so he can get his commission returned to him. Now, the district court wasn't impressed by our evidence of Landa's knowledge concerning this back condition. At page 10 of the order states, the court does not find convincing plaintiff's argument based on the alleged oral representations made by Almond to Landa. Regardless of Almond's disclosure to Landa that he sprained his back pulling a sign, Almond had a duty to read the answers in his application and correct any errors. It is our position that the district court erred in making that statement as a matter of Montana law. There is a case called Weber v. Massachusetts Bonding in which the policy also contains certification language that let the insured know that if he signed it and there were any false answers, the coverage would be forfeited. In that case there was an agent, his name was Mr. Bishop, who filled out the application for the insured, very similar to the situation in our case. The agent asked if the insured ever had appendicitis. The insured answered yes. The agent wrote no on the application form. And then he explained to the insured, well, that was over with. We don't see why it wouldn't be all right to just put down no. Well, that's very similar to the reasonable inferences that can be drawn from the evidence in this case. Under Montana law, which the Court did not consider, it's more important to consider the circumstances of the application process than the certification language. I think what I'd like to do at this time is show the Court a couple of illustrative aids that I brought to help put the time frames into perspective. I have a chronology here. And I won't belabor it other than to note that in May of 94 was the first time that Al signed an application for a policy. And then in June of 94 there was a physical examination that was done of Al. And it included some health questions. And that was the very first health questionnaire that was prepared. Then in November and December are the two incidences regarding the sign-pulling incident, the incident about which Leonard Landa was informed. And then on February 15th, Al signed the application for the disability policy and paid the premium. And that was the second time that a health questionnaire was filled out. The medical history questionnaires tell a story that is probably much more clear than any story told by Agent Landa. As we've pointed out in our briefs, his testimony was all over the board as to what he might have asked Al, what Al might have told him, completely contradictory. Well, in this particular, I've taken sections of the two health questionnaires right here, the one that was prepared by the nurse and the one that was prepared by Agent Landa on behalf of Al Almond to show you the amazing coincidences. And then down here what I've done is put it in typewritten form so that it's easier to read. But if you look at the health questionnaire, it's got the question that required the details to be provided. And then the date is given. And instead of, what our belief is, is that one was copied from the other. Instead of putting March 94 or 3-2-94, both of them have the date written in exactly the same form, 3-94. And then it gives the name of the doctor. And instead of saying Dr. William Beatty or Dr. Bill Beatty or Beatty, M.D., both of them have the redundant doctor at the front of the name and M.D. at the back with the W.M. abbreviated in exactly the same form. Both of them indicate sinus infection. And both of them indicate an antibiotic for 10 days. Then on the 1293 entry, again, it's the same. There's an ER room that's documented auto accident. It doesn't say vehicle accident or car accident. It is very apparent that this was copied, one from the other. And I just ask the Court to consider that as you deliberate over this case. And in looking at the full application forms, you'll note that part of the second one that was filled out on February 15, 1995, was left blank. And it was two questions. One was a question about family history. And the other was a question about the personal physician. Now, if you compare the entire documents between Excerpt of Record 70 and Excerpt of Record 72, you'll see that the first one didn't have that as a question. So, of course, if Al and Landa are not discussing this, he's got nothing to put down. And if Landa is simply copying this, then he's going to leave those blank. And the record is undisputed that those were filled in later by Landa's secretary over in Missoula. I think as a final point during my initial remarks, I'd like to point out that the Court erred in determining that any of the claimed misrepresentations could be determined as a matter of law. Under Montana law, the case that is on point is the Schneider case. And the Court seemed to think that by failing to disclose doctor visits, that meant that the misrepresentation was automatically material. But the Schneider case involved an insured who failed to disclose six different doctor visits. And they weren't just for a pulled muscle. They were for alcoholism and depression. Despite that, the Court held that the question of the materiality of that omission was a matter of fact. I'd like to remind the Court about the... In the Schlemmer case, the Schlemmer, if I'm pronouncing that correct, a court characterized the Schneider decision basically saying if the application contained a question, that made it material and the applications do contain questions about consulting doctors. That is correct. But in Schlemmer, there was really no issue as to misrepresentation, or excuse me, as to materiality. So any aspect of that case that is dealing with that issue is mere dicta. In that case, there was an insured who had been treated for hypertension,  The real basis for that decision was a failure of proof. The insured said that the agent most likely had knowledge of his medical condition, and he did so based on a medical note that he submitted, which showed that the doctor was going to recheck his oxygen if he still needs it. And his point was that the agent should have known that he was on oxygen at the time that he was in the bank getting the insurance. Yet there was no affidavit by the insured himself saying he was on oxygen. So it was asking the court to take a huge leap of faith from that medical note to concluding that the agent had knowledge. But materiality really wasn't at issue in the case of Schlemmer. I'd like to close now and reserve my remaining time for rebuttal. May it please the court, James Jones, counsel for Minnesota Mutual Life Insurance Company. I want to discuss just briefly for a moment that comparison and the suggestion that the agent may have copied part of the 1995 information from the 1994 life insurance application. It doesn't matter whether he did or he did not because the point is it was done in the presence of the insured, of the applicant. It was done with the applicant's participation. And one part of the record of the excerpts of record and the supplemental excerpts of record that is incomplete here is one page of the deposition of a witness, Lynn Tacky, T-A-A-C-K-E. Plaintiff's appellants included page 14 at excerpt of record 183. We did not include any part. But what is missing and should be a part of the excerpt of record but is a part of the record is page 15 of Lynn Tacky's deposition where she explains that that 94 application questionnaire was something that was not in the possession of the agency. In other words, it was only in the possession of Mr. Ahman because he had his 94 policy. So if they got the 94 policy out, his copy of it, his original, while they're doing the 95 application, perhaps they did take this information. But he was present and had the opportunity at that point in time to say, well, gee, a couple months after that, just a couple months before now, I've had serious back problems. I've been to a chiropractor. I've been to a doctor. My problems are much worse. Instead, we know that he didn't do that. We know that he signed and certified the application saying it was true and complete the way it was stated. So it is, whether it was copied or not, it's simply immaterial to the issues in the case. The district court, of course, considered all of that information at the time it made its decision. I disagree. But Lynn didn't consider that page of the deposition if that's not in the record someplace. It's in the record. The entire deposition was before the district court. The deposition itself, was that page in any way singled out or discussed as part of the argument or discussed in the memoranda submitted to the court? I cannot recall. This case has been around since 1996. I don't recall the extent to which it was discussed. It was before the court. And we did have both oral argument and extensive briefing on the case. I disagree with the appellant's counsel that the district court misapplied the law. The controlling precedent are the 2001 decisions of the Montana Supreme Court in Schneider, excuse me, in Schlemmer and in the Steinbeck case, both of which dealt with the questions of materiality and the questions of inquiry notice. The Schneider case is applicable as Your Honor pointed out a moment ago. It set forth the rule that something is material as a matter of law if there is a question in the application. And here, of course, there was a specific question calling for disclosure of treatments of back condition. And so it is material as a matter of law. The court also based its decision on the uncontroverted evidence that under the objective standard of subsection B of the statute that the underwriters had testified that this was material to the risk being assumed and there was no contrary testimony to that. Again, back in the Schneider case, several years earlier, the court had noticed, had noted that the plaintiff insured had called an expert witness to argue over that. Well, there was no expert witness and no other witness that argued with the underwriters in this case and their testimony backed up what we already know as a matter of law, the materiality by the fact of the application question. The statute in subsection C that the court also relied upon provides a subjective standard. Would the company in good faith have issued this policy had it known this information? And again, the testimony was uncontroverted as the court specifically found in its order and she was entitled to rely upon that information in making the decision. The district court also found that the insured was bound by the application that he had signed and that he had certified was true and correct. And I don't think that there's any argument. There's just been kind of a, let's ignore that point of law. But here we have a 50-year-old realtor, a real estate broker, a knowledgeable businessman, and president of his company, a good-sized real estate company who signed and certified an application with relatively simple, straightforward questions about his health. The attempt here is made to say that, well, this is bad policy. It puts the burden on the insured when it should put the burden on the insurance company. I think the best response to that was the Fourth Circuit's decision in the Rutherford case where it said it would be a poor policy indeed to put the burden not on the insured to disclose his health but on the insurance company to have to discover it. I'd like to focus for a moment on what the agent knew. It seems to me, and I speak only for myself, not for my colleagues, what gave me at least brief pause is I think what's been called inquiry notice. And that is, in this case we know the agent knew something, which begins to distinguish the case from the beginning from a sort of slumber which says it would have been pure speculation to go further. But here we know the agent knew something about a back problem. It's not clearly defined exactly what it is the agent knew. There are two parties to the conversation. One is no longer with us and Mr. Landa's testimony was at least somewhat inconsistent or he lacked memory. He said, for example, if I understand correctly, that he did not know one way or the other if he asked Mr. Ahman about whether he had seen a doctor. And we just don't have testimony beyond that point. But given the suggestion that the agent knew something, does that create an issue that needs to go to a jury? No, it does not because as the district court found and she was applying Steinbeck, 2001 Montana Supreme Court decision and the Schwimmer case and Judge Lovell's federal district court case in Murdoch in all three of those there was the same kind of little bit of information. In Steinbeck, the insurer's wife the insurer had died but the insurer's wife said that she was present at the time of taking the application and that she had disclosed that he had hardening of the arteries. And that would involve a little bit of information but the leap is a pretty big one because then they're trying to say that the agent should have figured out from that there might be something wrong with the insurer's memory leading to Alzheimer's. That's correct. I don't think it was such a big leap because I think what the court what the Montana courts have done both the Supreme Court in Schwimmer and in in which in Schwimmer the agent was dead and we had the insurer's claim of as to that he didn't know what was in the application he didn't read it when he signed it that sort of thing. Based upon the certifications in both cases the Montana Supreme Court rejected the claim of inquiry notice. What they have done in Montana I'm not sure that's quite the case. Schwimmer goes on to discuss inquiry notice and doesn't say because of the certification this issue is closed what it says is inquiry notice would be pure speculation there's not a factual basis there. And Weber would seem to say as Mr. Glazer argued that in that case granted the facts were rather egregious but the fact that there is a questionnaire filled out and signed doesn't close the possibility that the agent actually knew that there were things there and the agent told the insurer not to worry about it we don't mean that. But it's it can't be said that that piece of paper forecloses the possibility of inquiry notice there's some obligation on the part of the agent to convey information to the company. Well I think what we can say out of the the 2001 decisions of the Montana Supreme Court and the 1990 decision of Judge Lovell in the Murdoch case is that Montana has a very high standard for inquiry notice. I mean there's just to show that there is some is notice of a general condition and I think that's was part of the language again maybe that's perhaps the Rutherford decision general knowledge is not the specific knowledge when it's denied in an application. But I think that Your Honor  we're hit on the point when you said well what did the agent know? We know that in his deposition he specifically denied that he had been told about these back treatments and about seeing the doctors. So he did say when we were when I inquired about his back or when he said something about his back I don't remember if I asked him whether or not he'd been to a doctor. To take that any farther is to speculate. We have no other evidence in the record to go beyond to say did he know something more. So they're basically asking that the jury be allowed to speculate that perhaps he knew something more. On the other hand we know that when he was asked did he tell you about these treatments with the doctors at any time the answer was no. And that set forth in the deposition quoted in the briefs. So I think we know as much as we are ever going to know as to exactly what the agent knew. There is no other witness that's going to come testify in this case. In all three of these cases we know this has happened. One of the key parties have died. The agent in one and the insured in two of them. We cannot now speculate. I think the on one level we have to speculate because not that facts didn't occur facts occurred that we can't be certain of either because of a failure of memory or an absence of a witness. And we know that the agent knew about a back problem. And we know that the agent knew there was a  episode when he pulled in November when he pulled a sign out of the yard. I don't know whether it was a political sign or a real estate yard sign but some kind of small sign that pulled out of the yard. And that was an acute episode of back pain. And that's pretty much where we can be confident. Is there anything else that we know with confidence? I guess we know that Mr. Landa has testified that he did not learn of consultations with doctors as a result of the back pain. We know  did not receive a chiropractor treatment. That's right. We know that the treatments were not disclosed and we know that we have a signed certified statement from the insured that does not disclose that information. And I think this is a great judgment. But those inferences have to have a basis in the evidence in the record. And that's where we cannot go beyond what the record shows that the agent knew in this case. We cannot just simply say that the jury should be entitled to speculate. I think the Murdoch case is very similar in that we have disclosure of general problems of drinking and of alcoholism but not of treatment for alcoholism and Judge Lovell in that case again applying Montana law found that there was not inquiry notice. One of the questions and I'll take the 1995 application one of the questions asked during the past ten years have you had or been treated for and it's K back or neck pain obviously there's a check no. Now if the agent knew there had been back pain in the episode preceding November was the agent on notice that something was askew and ought to be inquired into? Well, I think it's the same thing. Does the information that was provided to him and the way in which it was provided to him meet the standard for inquiry notice? In all of these cases it's not what would you learn by further inquiry but was the information sufficient? And so just as we just discussed it's the same thing. There's two parts to that question. Have you had or have you been treated for? We know that at least to some extent the have you had the answer is that the agent knew that he had had some. The question have you been treated for there's no evidence in the record that that was ever disclosed to the agent. And indeed the agent can't recall whether he asked whether he asked. But since he says he can't remember whether he asked when they were having that discussion but he can say that the questionnaire was prepared the questions were asked and he does say that I was not told about the going to the doctor and I was not told about the treatments. The only reasonable inference can be drawn that is that if he had asked back at the time in connection with that  what was that question from? That's actually set forth on those same pages of the Lynn Catkey deposition 14 and 15. When she received it as Mr. Landa's assistant and had to process it she noticed that that question was left blank. She called Mr. Landa and asked him the name of the personal physician. And that's set forth on pages either 14, 15, or 16 of her deposition in the record. And she also testified that his name was left blank if the agent was sitting there asking the questions. I don't know, but that was her job to catch it to see if anything was omitted. And that's what she testified specifically. And she testified those are in my handwriting. And she said I remember that I called him to obtain that information. The part of the claim here ignores the fact that any inquiry notice was erased by Amann's specific denials of treatment. And the Steinbeck case is the same form. And the denial of treatment now has signed and somebody fills in after the fact the name of Dr. Donaldson. So at least some of the information was filled in after he certified the form. And at that time he     was  Montana Supreme Court and the court was very correct in her interpretation of Montana law when she said the insured applicant is bound by his signed and certified application. And that's exactly what Steinbeck said to Montana Supreme Court in 2001. They looked at the clarity of that question. The I just well I guess I'm out of time. May I have one further comment? I took your time to make your comment. Okay. Thank you. With respect to the bad faith counts, the other counts that were also dismissed by the court, the district court did tie her dismissal to the dismissal of the contract claim, the $32,000 contract claim. As we have set forth in our brief, it's our position that the record is clear that there is no evidence to support those and there is an independent basis to affirm the dismissal of those counts. Thank you. Thank you. Ms. Weiser. Thank you. I think that we don't need to rely on speculation. Instead, the documents themselves speak volumes. Because there was this blank left on application part 2 in the 95 application process, I think there's a reasonable inference that Al Alman was not present when that document was filled out. Otherwise, as the judge has noted, he would have been asked about that question and filled it in at that time. There is a bit of testimony by Landa that confirms that Al Alman may not have been shown the application. At ER 101 and 102, Landa testified, I did not ask him those questions, go through those questions on a specific basis. And again, Landa's testimony at record 97, where Landa testified that he did not recall whether he had Al look at application part 2. With respect to the question about doctor visits, there is at least some testimony that Landa did ask Al about doctor visits. And I will quote from page 17 of Leonard Landa's deposition. I asked Leonard Landa the question, when Al discussed with you the problems that he was having with his back, did you follow up with him and ask him whether he had seen a doctor about his back? The answer was, we talked about it. He said that he had. We talked about it. Well, you know, we're not present listening, and you were, so you have a different perspective. I've looked at that text several times. And he said that he had, and that he abruptly changes, people change sentences in midstream, and I really can't tell what comes after the word had. He said that he had thought about it. He said that he decided it didn't really bother him. He kind of passed, so I understand the inference you're trying to draw, but it's a pretty thin read to say that that leads to a statement that says he had gone to  I don't know how else you could interpret the term, we talked about it, when I just asked him about doctor visits. But that would be, I think, an inference that a jury would be entitled to determine. On the issue of whether Al should be bound by the certification, I think that Montana law is clear that the reasonable expectation of the insured's controls, there were two cases I submitted as supplemental authority that talk about the reasonable expectation of the insured controls over the actual policy language. There's also the Curtis case and the Fillinger case in which there was no duty by the insured to read the policy and the policy was actually conformed to meet what the insured had expected it to read. And I guess in closing, I'd like to say that remember the important facts concerning imputed knowledge and inquiry notice. Under the imputed knowledge doctrine, the following logic applies. Minnesota Mutual's questionnaire asked, did you ever backstrain your back? The truthful answer would have been yes. Agent Landa knew the truthful answer, yet he marked no on behalf of Al Ahman. By operation of law, Minnesota Mutual knew the truthful answer and cannot claim misrepresentation. In addition, even if there was no evidence about a doctor visit or discussions of doctor visit, Al informed Landa about his backstrain. Landa should have asked Al if he had seen a doctor visit. If Landa failed to ask or failed to record the fact of doctor visits, then it is Landa's negligence and Minnesota Mutual is a stop to rescind the policy. Knowledge of the backstrain should have been imputed to Minnesota Mutual as a matter of law. The only question raised by Minnesota Mutual was the same one that you asked me when I first started arguing this case, and that is the extent of Landa's knowledge. Well, that would be a question of  discretion to have a jury consider that factual issue as well as have the court make some decisions on the issues of law that will guide this case on remand. Thank you very much. Thank you. The case is submitted. We will take a brief recess for approximately ten minutes. All rise.
judges: Browning, Alarcon, Clifton